**In re The GOODYEAR TIRE & RUBBER COMPANY, Relator.**

**No. 05–10–00485–CV.**

Court of Appeals of Texas, Dallas.

June 23, 2010.

Ruth Greenfield Malinas, J. Michael Myers, Ball & Weed, San Antonio, TX, for Relator.

Judge, 134th Judicial District Court, Dallas, TX, for Respondent.

William H. Stout, Graham E. Sutliff, Sutliff & Stout, PLLC, Houston, TX, Jeffery Mark Kershaw, Chamblee & Ryan, P.C., Dallas, TX, for Real Party in Interest.

Before Justices BRIDGES, LANG–MIERS, and MYERS.

## OPINION

Opinion By Justice LANG–MIERS.

In this mandamus proceeding, The Goodyear Tire & Rubber Company seeks relief from the trial court's order compelling it to respond to requests for production and the court's protective order, which Goodyear contends does not provide adequate protection for its trade secrets. Because we conclude that the trial court abused its discretion, we conditionally grant the writ of mandamus.

### BACKGROUND

This is a products liability case. Fredrickson sued Goodyear and others alleging that a Goodyear tire she and her husband purchased was defectively designed, manufactured, and marketed. She alleged that in May 2007, she and her husband purchased two Trail Buster Radial D/T LT245/75/R16 Load Range E Kelly tires for their Ford F–250 truck. She alleged that she and her husband were on the way home from the feed store in December 2007 when the tread on one of the tires separated and caused the truck to enter a side skid and roll multiple times. Her husband was ejected from the truck and died many days later as the result of his injuries.

Fredrickson alleged that the tire, although purchased in 2007, was manufactured in 1998. She alleged that the tire was defective in design because it did not incorporate internal components, including nylon strips or overlays, "with the requisite fatigue resistance to counter the constant centrifugal force" resulting from normal operation; and because the chemical compound was not sufficient to maintain adhesion "between the belt package" under normal use. She alleged that the tire was defectively manufactured because the rubber between the tire's components was not "manufactured to a specification that would withstand the fatigue caused by the centrifugal forces" resulting from normal use, causing the separation of the tire's internal components, including the steel belts. And she alleged that Goodyear failed to adequately warn her about the dangers associated with purchasing a tire that did not contain nylon strips or overlays, that the adhesion of the tire's internal components could deteriorate over time, or about the tire's propensity for tread/belt separation under normal use.

Fredrickson included 126 requests for production with her original petition. The requests at issue in this proceeding sought:

- plant specifications, practices, and procedures for the plant where the accident tire was manufactured;
- documents about tread separations, tread/belt separations, and belt edge separations in passenger and light truck tires;
- documents about recalls and replacement programs for any Trail Buster tire and any tire with the same green tire specification or skim stock as the accident tire;
- adjustment data, incident reports, and product liability reports for all tires

with nylon overlays, zero degree cap piles, or nylon belt edge strips, Trail Buster tires, and tires with the same green tire specification or skim stock as the accident tire;

- all reports and other documents reflecting tread separation occurrences of steel belted radial passenger and light truck tires;

- reports and other documents reflecting failures in service of steel belted radial passenger and light truck tires in which a tire suffered tread or tread belt separation and caused a subsequent loss of control of the vehicle;

- documents and reports of adjustment records provided to plant chemists, management or corporate headquarters;

- documents reflecting incident reports or complaints of tread belt separation for Trail Buster tires and for all tires with the same green specification or skim stock as the accident tire;

- test wheel data, durability tire testing, endurance tire testing, and high speed tire testing data for all tires produced at the same plant as the accident tire;

- air permeability testing data, specifications, and standards for Trail Buster as it relates to testing data for inner liners;

- a sample liner for tires with the same green tire specification as the accident tire;

- documents about product change notifications, design change notifications, and compound change notifications for the accident tire;

- documents about specification changes, material changes, and processing changes;

- vibration, ride disturbance, and ride return summaries, graphs, and charts

that include the accident green tire specification;

- plant process reviews for the plant where the accident tire was manufactured;

- adjustment follow-up reports for changes made to the accident tire;

- documents relating to the testing, cost analysis, use of, competitor use evaluations, and discussions of nylon overlays, spiral nylon overwraps, nylon cap plies, belt edge gumstrips, and belt wedges;

- documents showing the per-unit cost of the type of belt wire used in the accident tire;

- documents that demonstrate the type of belt wire used in tires manufactured in 1998;

- documents provided to NHTSA regarding tread separations.

Most of these requests sought information from 1995 to the present.

Goodyear objected to the requests alleging that they were overly broad, unduly burdensome, and sought information protected by the trade secret privilege. Pursuant to a rule 11 protective order agreement, Goodyear agreed to produce some documents responsive to Fredrickson's requests. However, Goodyear and Fredrickson each filed a motion for protective order and attached a sample proposed protective order. Fredrickson also filed a motion to compel responses to her requests. During a hearing on the motions, Fredrickson withdrew her request nos. 8, 10, 20, and 89.

After the hearings, the trial court issued an order compelling Goodyear to provide a "full response" to the requests within thirty days of the date of the order. Although the court restricted the time frame on some of the requests to five years, it otherwise overruled Goodyear's objections.

The trial court also issued a protective order incorporating provisions from both parties' sample proposed protective orders. In this mandamus proceeding, Goodyear challenges the trial court's order compelling it to respond to the requests, arguing that the requests are overly broad and violate its privilege against disclosure of trade secrets. Goodyear also challenges the trial court's protective order, arguing that it does not provide adequate protection for Goodyear's trade secrets.

## STANDARD OF REVIEW

■ Mandamus relief is available when the trial court abuses its discretion and there is no adequate remedy by appeal. *In re Deere & Co.*, 299 S.W.3d 819, 820 (Tex.2009) (per curiam). Although the scope of discovery generally is "within the trial court's discretion, the trial court must make an effort to impose reasonable discovery limits." *Id.* (quoting *In re Graco Children's Prods., Inc.*, 210 S.W.3d 598, 600 (Tex.2006) (per curiam)). A trial court abuses its discretion if it orders discovery exceeding the scope permitted by the rules. *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex.2003) (per curiam); *K Mart Corp. v. Sanderson*, 937 S.W.2d 429, 431 (Tex. 1996) (per curiam); *Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex.1995) (per curiam).

## REQUESTS WITHDRAWN BY PLAINTIFF

Goodyear challenges the trial court's order compelling it to respond to Fredrickson's request nos. 10, 20, and 89.[1] In a hearing on the discovery motions, Fredrickson withdrew those requests. Accordingly, we conclude that the trial court abused its discretion by compelling Goodyear to provide a "full response" to request nos. 10, 20, and 89 and that Goodyear has no adequate remedy by appeal.

## REQUESTS THAT ARE OVERLY BROAD OR UNDULY BURDENSOME

■ Goodyear also contends that Fredrickson's requests are overly broad and it would be unduly burdensome to provide a response. A request for production of documents must be tailored to include only matters relevant to the case. TEX.R. CIV. P. 192.3; *In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex.1998) (per curiam). Although we decide this proceeding on trade secret grounds, we anticipate that the question whether the requests are overly broad or unduly burdensome will arise again. In our view, many of the categories of documents that Fredrickson requested are overly broad and unduly burdensome. We foresee that the trial court will first tailor the requests to only those matters relevant to the case, and then consider whether those categories of documents are protected by the trade secret privilege.

## REQUESTS FOR TRADE SECRETS

■ "A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996), *superseded by statute on other grounds*, Act of Apr. 17, 1997, 75th Leg., R.S., ch. 26 §§ 1–4, 1997 Tex. Gen. Laws 68, 68, *as recognized in Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 3 (Tex.1999). Evidence rule 507 authorizes a party to refuse to disclose and to prevent others from disclosing trade secrets if it will not tend to conceal fraud or otherwise work

---

**1.** Goodyear does not appeal the portion of the trial court's order compelling it to respond to request no. 8.

injustice. TEX.R. EVID. 507. Rule 507 requires the party resisting discovery to first establish that the information sought constitutes a trade secret. *In re Cont'l Gen. Tire, Inc.,* 979 S.W.2d 609, 610, 613 (Tex. 1998). The burden then shifts to the requesting party to establish that the information is necessary for a fair adjudication of its claim or defense. *In re Bridgestone/Firestone, Inc.,* 106 S.W.3d 730, 732–34 (Tex.2003); *Cont'l Tire,* 979 S.W.2d at 610, 613. A trial court abuses its discretion if it orders disclosure of trade secrets when the requesting party has not carried its burden to show the information is necessary for a fair adjudication of its claim. *Bridgestone/Firestone,* 106 S.W.3d at 734; *Cont'l Tire,* 979 S.W.2d at 615.

Goodyear contends that it presented evidence that the information sought in Fredrickson's requests [2] is protected by the trade secret privilege, and that Fredrickson did not carry her burden to show that the information was necessary for a fair adjudication of her claims.

■ We weigh six factors to determine whether a trade secret exists: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Union Pac. R.R. Co.,* 294 S.W.3d 589, 592 (Tex.2009) (per curiam) (citing *In re Bass,* 113 S.W.3d 735, 739 (Tex.2003)).

Goodyear presented the affidavit testimony of Richard Olsen, an engineer who worked at Goodyear for over forty years in various capacities involving the design, manufacture, testing, and analysis of tires, and James M. O'Neil, Goodyear's Director IT Security and Controls. Together, they offered evidence on each of the six factors.

### *Factors One, Two, and Three*

■ Factors one, two, and three deal with the confidentiality of the information: the extent to which the information is known outside Goodyear; the extent to which Goodyear shares the information within its company; and the measures Goodyear takes to guard the secrecy of the information.

Goodyear's affidavit testimony showed that information relating to the design, testing, curing, and cost of the various components involved in the tire manufacturing process, the manufacturing process itself, plant procedures, adjustment and production data, compound information, and research and development work are kept strictly confidential at Goodyear and the information is not shared outside the company.

Olsen explained that the process for manufacturing a tire begins with what is called a "tire specification." He stated that tire specifications are valuable assets that Goodyear carefully guards because even "fragments" of this information would offer insight into Goodyear's experience. He testified that a radial tire consists of six major components, each of which is engineered to serve a specific function:

> The first is the inner liner which is a unique rubber compound that acts as the tire's inner tube and retains air in the tire. The second are the tire beads

2. The trade secret argument relates to Fredrickson's request nos. 4, 9, 11, 12, 16, 17, 18, 19, 21, 22, 23, 24, 25, 28, 29, 31, 45, 46, 47, 49, 50, 51, 63, 64, and 90.

consisting of steel wires and a unique rubber compound coating which secure the tire to the rim once the tire has been inflated. The third are the body plies which give the tire the strength and structure necessary to retain the air pressure to carry the specified loads. The fourth are the steel belts, which are a composite of steel cords and a rubber compound that provide additional strength and stability in the tread area. The fifth is the tread, which consists of a specially formulated rubber compound and specially designed tread element geometry that provide wet and dry traction, treadwear, rolling resistance, and ride and handling characteristics. Tread geometry, including rib, lug and groove location, depth, size, shape, density and proximity to one another can alter the location and degree of forces/stresses on the tire carcass and change use and ride characteristics. The sixth are the rubber sidewalls, which protect the internal structure against minor cuts and abrasions and provide aesthetic appearance to the tire.

Olsen testified that the chemical reactions and material movement that occur during vulcanization make "it impossible to successfully 'reverse engineer' a tire from its cured to pre-cured state." As a result, he testified that access to design details, production methods, and compound formulas are restricted within the company. He explained that Goodyear's tire designs "are an integrated compilation of several unique elements and the exact combination of those elements is unique...." For that reason, he explained that the "technical information, including design, manufacturing, testing, adjustment and quality control information, includes confidential research, development, production, and marketing information .... and are considered by Goodyear to be confidential[,] proprietary and trade secret."

Olsen explained that Goodyear maintains the secrecy of this information within the company by providing this information to its employees only on a "need to know" basis. Olsen and O'Neil explained that access to this information and to plants, offices, and technical centers is limited and requires the use of identities, passwords, and key cards, and that security guards are present to enforce these security measures.

Olsen also explained that Goodyear's tire designers know rubber compounds only by code numbers and not by chemical formulas. He also explained that the transport of documents between buildings is tightly controlled, and that any employee who does not work in a particular plant must obtain approval in writing before the employee can enter that plant. He stated that employees must agree in writing not to disclose confidential information to persons outside the company, they are regularly reminded of this policy, and they must return all documents when they terminate their employment with Goodyear.

Olsen testified that Goodyear's policies prohibit the disclosure of information about design, materials, construction, manufacturing equipment and processes, warranty policies, terms or conditions of sale, and customer classification. He also testified that no single computer within the company contains all confidential information and no single employee within the company has access to all confidential information. He stated that an employee's level of access is determined by the employee's job classification.

O'Neil testified that access to computers is restricted using identity and password authentication, access rights, authority levels, and use of independent computer systems that are not linked to other networks or the internet. He also explained that

Goodyear has physical controls to limit access to the buildings housing Goodyear's computer systems.

We conclude that Goodyear has established that it maintains procedures to keep the information requested secret. Accordingly, we conclude that factors one, two, and three weigh in favor of finding that information sought contains trade secrets. *See Union Pac.*, 294 S.W.3d at 592; *In re Cooper Tire & Rubber Co.*, 313 S.W.3d 910, 916 (Tex.App.-Houston [14th Dist.] 2010, orig. proceeding).

### *Factors Four, Five, and Six*

 Factors four, five, and six deal with the value of the information to Goodyear and its competitors, how much was spent to acquire the information, and how easy it would be to acquire or duplicate the information.

Olsen testified about the value of the information gained from each stage of the tire manufacturing process to Goodyear and its competitors. He explained that it is impossible to "reverse engineer" a tire from its cured to pre-cured state, and, as a result, information about design details, production methods, and compound formulas would not be available to Goodyear's competitors unless discovered through a lawsuit. He explained that access to Goodyear's designs, engineering findings and procedures, test protocols and findings, manufacturing processes, and quality assurance systems would give a competitor access to information it otherwise would not have and allow the competitor to realize substantial cost savings and make adaptations to its own products.

Olsen testified that competitors could use the information requested by Fredrickson "to copy all or part of Goodyear's specifications, manufacturing processes, test protocols, research or marketing techniques, and policies [to] give them a technical advantage [over Goodyear] ... without compensating Goodyear for its expenses incurred in developing these ideas." As a corollary, he testified that a competitor's development cost for the concept, design, or component would be greatly reduced if it had access to tire specifications and other documents for Goodyear tires that Fredrickson seeks. Olsen testified that this "triple threat of a competitor's unearned savings, Goodyear's uncompensated expense and the competitor's market gain would result in an unfair competitive disadvantage to Goodyear."

Although Goodyear's affidavits do not state a dollar figure that it has spent in developing the various information sought by Fredrickson, Olsen stated that Goodyear's tire design process draws on prior designs, tests, and experience, and that Goodyear has invested "millions of dollars" on those prior designs and tests. He stated that Fredrickson has asked for information representing "many years and millions of dollars of research and development work by Goodyear."

Olsen also explained, as we have previously noted, that a competitor cannot obtain complete information about a Goodyear tire's design because of the difficulty in "reverse engineering" a tire from a cured to a pre-cured state. For this reason, Olsen stated that the information sought by Fredrickson cannot be obtained from any other source outside Goodyear.

We conclude that factors four, five, and six weigh in favor of finding that the information sought by Fredrickson contains trade secrets. *See Union Pac.*, 294 S.W.3d at 592; *Cooper Tire*, 313 S.W.3d at 916–18. We further conclude that Goodyear's evidence established six of the six factors. Considering the six factors in the context of the surrounding circumstances, we conclude that Goodyear established

that the information sought by Fredrickson contains trade secrets. *See Cooper Tire,* 313 S.W.3d at 918. The burden then shifted to Fredrickson to show that the information is necessary to a fair adjudication of her claims. *Bridgestone/Firestone,* 106 S.W.3d at 732–34. Goodyear argues that Fredrickson did not carry her burden.

Although the Texas Supreme Court has not provided a specific test to be applied in determining whether the requesting party has carried its burden to show that trade secret information is necessary to a fair adjudication of her claim, the court has stated that the test is not satisfied by general assertions of unfairness or relevance. *See Union Pac.,* 294 S.W.3d at 592–93; *Bridgestone/Firestone,* 106 S.W.3d at 732–33 (unfairness); *Cont'l Tire,* 979 S.W.2d at 613–14 (relevance).

■ In her motion to compel discovery responses, Fredrickson argued that she had a "right" to the information, the information was discoverable and "highly" or "clearly" relevant, and that Goodyear was trying to circumvent the discovery rules and restrict the flow of information. But she did not discuss her heightened burden under rule 507 for obtaining trade secret information. *See Bridgestone/Firestone,* 106 S.W.3d at 732–33; *Cont'l Tire,* 979 S.W.2d at 613–14. Fredrickson cannot satisfy her burden by general assertions of unfairness or relevance. *See Union Pac.,* 294 S.W.3d at 592–93; *Bridgestone/Firestone,* 106 S.W.3d at 732–33. Instead, she "must demonstrate with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *Bridgestone/Firestone,* 106 S.W.3d at 732–33. This specificity showing must be made with regard to each category of information that she requested and for which Goodyear has asserted the trade secret privilege. *See id.; In re Universal Coin & Bullion, Ltd.,* 218 S.W.3d 828, 833 (Tex. App.-Beaumont 2007, orig. proceeding [mand. denied] ) (involving order compelling resisting party to answer 53 requests for production). She did not carry that burden in her motion to compel responses to her requests.

In her briefing to this Court, Fredrickson contends that the trial court's order compelling Goodyear to provide a "full response" to her requests was not a ruling on Goodyear's trade secret privilege and that Goodyear may still assert the privilege in its responses to the requests. Alternatively, she argues in a footnote that even if the order was a ruling on the trade secret privilege, she provided "specific evidence regarding Goodyear's asserted privileges, [and] met her burden to show her need under Texas law." But she does not cite the record where her evidence can be found, and we are not required to search a voluminous record for evidence to support her argument. *See Most Worshipful Prince Hall Grand Lodge v. Jackson,* 732 S.W.2d 407, 412 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).

We conclude that Fredrickson did not carry her burden under rule 507. As a result, the trial court abused its discretion by ordering Goodyear to respond to the requests and Goodyear has no adequate appellate remedy.[3] *See Bridgestone/Firestone,* 106 S.W.3d at 734 (when requesting party does not carry burden to show trade secrets necessary for fair adjudication of claim or defense, party resisting discovery has no adequate remedy by appeal and

---

**3.** We do not express an opinion about whether some, all, or none of the trade secret information requested is discoverable in this case.

mandamus is proper); *Cont'l Tire,* 979 S.W.2d at 615 (same). Because the trial court erred by ordering Goodyear to produce privileged, trade secret information, it also erred by issuing a protective order. Accordingly, we do not need to consider Goodyear's complaint about the protective order. However, if the trial court ultimately orders Goodyear to produce trade secrets, rule 507 requires the trial court to "take such protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require." TEX.R. EVID. 507.

■ Among the requests that Goodyear stated it was challenging in this mandamus proceeding were request nos. 76 and 77. Those requests sought information about Goodyear's defenses. However, Goodyear did not separately brief those two requests, and its arguments under trade secret privilege and overbreadth do not discuss those specific requests. Consequently, we conclude that Goodyear has not shown it is entitled to relief on request nos. 76 and 77.

### CONCLUSION

We conditionally grant mandamus relief directing the trial court to vacate its order dated March 24, 2010 overruling Goodyear's objections to requests seeking trade secrets and ordering Goodyear to provide a full response to those requests within thirty days of the order. We also conditionally grant mandamus relief directing the trial court to vacate its protective order dated March 24, 2010. A writ will issue only if the trial court fails to vacate (1) its order dated March 24, 2010 which requires Goodyear to respond in full to Fredrickson's request for production nos. 4, 9, 10, 11, 12, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 28, 29, 31, 45, 46, 47, 49, 50, 51, 63,

64, 89, and 90 and (2) its protective order dated March 24, 2010.