

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00338-CV

IN RE PRAIRIESMARTS LLC AND                                    RELATORS
CASEY ROCKWELL

---------

## ORIGINAL PROCEEDING

----------

## **OPINION**

----------

### I. INTRODUCTION

Relators PrairieSmarts LLC and Casey Rockwell seek a writ of mandamus directing Respondent to vacate a September 18, 2013 order granting Real Party in Interest TD Ameritrade, Inc.'s rule 202 petition.  *See* Tex. R. Civ. P. 202. Because we hold that Respondent abused his discretion by granting the rule 202 petition and because Relators possess no adequate remedy at law, we will conditionally grant the writ.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Four former employees of TD Ameritrade subsequently became employed by PrairieSmarts.[1] Those four individuals are Dr. Renaud Piccinini, Michael Chochon, Chris Nagy, and Casey Rockwell. Dr. Piccinini obtained a Ph.D. in finance in 2004 and wrote his dissertation on risk and volatility in financial markets or so-called "Black Swan Events." Prior to working for TD Ameritrade, Dr. Piccinini helped develop risk models for the holdings of First National Bank of Omaha. Dr. Piccinini began working for TD Ameritrade in February 2010, and TD Ameritrade terminated Dr. Piccinini on May 2, 2012, after the Portfolio Margin model that he had helped to design received approval from the federal regulators at the Financial Industry Regulatory Authority (FINRA).[2] Chochon began working for TD Ameritrade in 2003, and he was the person who had hired Dr. Piccinini to perform the above-described work at TD Ameritrade. TD Ameritrade terminated Chochon on March 31, 2011. Nagy joined TD Ameritrade in August 1999 and served as Managing Director of Order Routing, Sales, and Strategy. TD Ameritrade terminated Nagy on May 26, 2012. Rockwell, a software developer and computer programmer, began working for TD Ameritrade in March 2004 and voluntarily left in October 2012 to work for PrairieSmarts.

---

[1]PrairieSmarts is a Nebraska start-up company.

[2]TD Ameritrade's counsel explained that "the [Portfolio Margin application] is something that the government requires of organizations like TD Ameritrade to demonstrate how we're managing risk in our clients' portfolios. And the government allows us to develop proprietary means to do that."

In January 2013, PrairieSmarts filed a patent application[3] for a program that PrairieSmarts calls PortfolioDefense™ and began beta testing the program. TD Ameritrade thereafter filed a rule 202 petition asserting that it appeared likely that PrairieSmarts's employees Dr. Piccinini, Chochon, Nagy, and Rockwell had—in designing PortfolioDefense™—misappropriated confidential and proprietary assets of TD Ameritrade in violation of the nondisclosure provisions in their respective employment contracts. By its rule 202 petition, TD Ameritrade sought to depose PrairieSmarts and Rockwell and to have PrairieSmarts and Rockwell produce various documents at their depositions. PrairieSmarts and Rockwell filed answers to the rule 202 petition, denying all allegations in the petition and objecting to the depositions and production of the documents sought by TD Ameritrade on the ground that both sought privileged trade secret information belonging to PrairieSmarts. PrairieSmarts's answer also objected to venue in Tarrant County.[4]

Respondent set a hearing on TD Ameritrade's rule 202 petition; a week before the hearing, PrairieSmarts filed affidavits from Dr. Piccinini, Chochon,

---

[3]Patent applications are maintained by the United States Patent and Trademark Office as confidential for eighteen months after the application is filed or until issuance of the patent, whichever comes first, and the information regarding patent applications may not be released before that time without the permission of the applicant. *See* 35 U.S.C.A. § 122 (West 2001).

[4]Because the arguments of Relator PrairieSmarts and Relator Rockwell are identical in this original proceeding, except as to the venue issue, we sometimes refer to both Relators collectively as PrairieSmarts.

3

Nagy, and Rockwell, asserting that no confidential information belonging to TD Ameritrade was utilized in creating the code for PortfolioDefense$^{TM}$ and claiming that the information sought by TD Ameritrade constituted trade secret information belonging to PrairieSmarts.

At the hearing on TD Ameritrade's rule 202 petition, TD Ameritrade argued that the facts as set forth below constituted "smoke," "red flags[,]" or "the indicia of a potential appropriation of trade secrets case" sufficient to justify the requested discovery. TD Ameritrade provided Respondent with three demonstrative exhibits that it had created utilizing information from the four affidavits filed by PrairieSmarts. The three exhibits are one-page typed sheets titled, "Facts About PrairieSmarts's Principals," "Timeline," and "Facts Justifying Investigation." The documents show the dates the four former TD Ameritrade employees left TD Ameritrade and began employment with PrairieSmarts, provided a comparison of the time it took to create the Profit Margin model at TD Ameritrade versus the time it took to create PortfolioDefense$^{TM}$ at PrairieSmarts, and stated that the following facts justified TD Ameritrade's investigation via the discovery it had requested from PrairieSmarts: the fact that three of the four PrairieSmarts principals were directly responsible for TD Ameritrade's confidential risk analysis; the fact that PrairieSmarts's principals have thirty-one combined years of TD Ameritrade tenure; the fact that five days after Dr. Piccinini left TD Ameritrade, he co-founded PrairieSmarts; the fact that three months after Rockwell started working at PrairieSmarts, a patent application was filed for

4

PortfolioDefense$^{TM}$, while it took fourteen months after Dr. Piccinini's hire at TD Ameritrade until the Profit Margin application was submitted to FINRA; the fact that similarities exist between the two products—TD Ameritrade contends four matching components are observable by comparing PrairieSmarts's website and the FINRA application for Portfolio Margin;[5] and the fact that the products have nearly identical outcomes, which TD Ameritrade explained was PortfolioDefense$^{TM}$'s having nearly the same predictive capability as TD Ameritrade's Portfolio Margin. TD Ameritrade argued that these "red flags" concerned TD Ameritrade and established "that there is a significant advantage to be gained for [TD Ameritrade] to do some investigation, some discovery to see how these concepts that line up on both sides are actually performed and whether they are performed using confidential information [from] TD Ameritrade."

At the hearing, PrairieSmarts argued that the circumstances TD Ameritrade had characterized as smoke or red flags were nothing more than legal activities. PrairieSmarts asserted that some of its managing members— three of whom had been terminated by TD Ameritrade—had gone on to other employers before joining PrairieSmarts and had continued to work in the same area of expertise. PrairieSmarts contended that it was a mischaracterization to say that it took Dr. Piccinini and the team at TD Ameritrade fourteen months to create Portfolio Margin because twelve of the months were "simply TD

---

[5]TD Ameritrade also admitted into evidence screen shots from PrairieSmarts's website and the FINRA application for Portfolio Margin.

Ameritrade['s] using their Portfolio Margin to then get to the one-year audit that FINRA would do." PrairieSmarts denied that PortfolioDefense™ was based on any intellectual property of TD Ameritrade and asserted that TD Ameritrade's Portfolio Margin is different from PortfolioDefense™ because Portfolio Margin was designed for use by brokers—not individual investors; was created to satisfy a government-mandated risk analysis requiring brokers to evaluate volatility and risk of only 3,000 to 4,000 specifically identified stocks; and is a calculation that computes for brokers certain margin requirements for highly leveraged portfolios so that brokers can determine when a customer's position becomes too risky and threatens the broker's margin loan. PrairieSmarts contended that, conversely, PortfolioDefense™ was designed for use by individual investors, is not limited in its analysis to 3,000 or 4,000 specifically identified stocks, is not required to be submitted to FINRA, and that its design constitutes trade secrets of PrairieSmarts. PrairieSmarts concluded that Portfolio Margin and PortfolioDefense™ are "importantly different" and that TD Ameritrade should not be allowed to take a look "under the hood" at PortfolioDefense™ only to determine that it is not based on TD Ameritrade's confidential or proprietary assets. PrairieSmarts also claimed that beta testing of PortfolioDefense™ is available through PrairieSmarts's website and that TD Ameritrade has the ability to participate in the beta testing[6] and to determine that way whether PortfolioDefense™ performs the same functions as the Profit Margin model.

---

[6]In his affidavit, Dr. Piccinini likens the beta testing to "a free trial of

6

During the hearing, Respondent decided that he would not rely exclusively on PrairieSmarts's affidavits in ruling on the asserted trade secret privilege but, per Texas Rule of Civil Procedure 193.4, would also conduct an *in camera* inspection of the documents sought by TD Ameritrade; Respondent ordered the documents' "production within one week in a Bates stamped fashion." Following the hearing, PrairieSmarts complied with Respondent's instructions and submitted documents under seal for an *in camera* inspection. Those documents have been filed with this court under seal.

Respondent subsequently issued a September 18, 2013 order finding that "the likely benefit of allowing TD Ameritrade to take the requested discovery to investigate one or more potential claims outweighs the burden or expense of the procedures set out herein." The order granted TD Ameritrade's rule 202 petition *in toto*, ordering that the requested depositions be taken within forty-five days and that "each deponent must produce . . . all of the documents requested by TD Ameritrade, Inc. as described in its Verified Petition for Rule 202 Deposition."

TD Ameritrade's rule 202 petition requested—and Respondent's order authorized—TD Ameritrade to depose Rockwell and PrairieSmarts and to elicit testimony on at least the following topics:

---

Microsoft Word[—the user can try the product] without being able to access the underlying programming and source code that allows Microsoft Word to operate and that is the confidential, proprietary, and trade secret information of Microsoft."

a. Any and all patent applications related to any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense™) filed by or caused to be filed by PrairieSmarts or any one or more of its managing members, including any and all patent applications that form the basis of PrairieSmarts'[s] claims that PortfolioDefense™ is patent pending.

b. The time horizon, statistical distribution, and confidence interval used in any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense™) and whether any one or more of the time horizon, statistical distribution, and confidence interval support what PrairieSmarts refers to as the "Range of Motion (History)."

c. The approach used in the implied volatility-based model of any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense™), including how PrairieSmarts converts option pricing to what it refers to as the "Range of Motion (Implied)."

d. Identification of methods, concepts, or ideas imported from the dissertation of Renaud "Ron" Piccinini into any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense™).

e. How PortfolioDefense performs calculations in 3/10 of a second, as PrairieSmarts claims.

f. Whether PrairieSmarts purchased, generated, or otherwise acquired historical market, financial, and/or securities data for use in designing, developing, and testing PortfolioDefense™, and, if so, from what source such data was purchased or otherwise acquired.

g. Whether PrairieSmarts used TD Ameritrade's Confidential and Proprietary Assets, including historical market, financial, and/or securities data, in designing, developing, and testing PortfolioDefense™.

h. The disposition, from October 2012 up to and including the present, of any privately purchased external storage device and other similar hardware that Mr. Rockwell used while employed by TD Ameritrade to access TD Ameritrade resources (including TD

8

Ameritrade's systems and data, including TD Ameritrade's Confidential and Proprietary Assets).

     i.    The design, development, and testing of PortfolioDefense™, including the identity of contributors and the history of development.

TD Ameritrade's rule 202 petition requested Relators to produce—and Respondent's order required Relators to produce—for inspection and copying at their depositions the following categories of documents:

     a.    Any and all patent applications related to any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense™) filed by or caused to be filed in any patent office by PrairieSmarts or any one or more of its managing members, including any and all patent applications that form the basis of PrairieSmarts'[s] claims that PortfolioDefense™ is patent pending.

     b.    Documents sufficient to show the identity of contributors and the history of development of any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense™), including information from a code repository, project tracking software, version control systems, and vendor contracts.

     c.    Documents sufficient to show any and all source(s) from which PrairieSmarts purchased, generated, or otherwise obtained historical market, financial, and/or securities data for use in designing, developing, and testing PortfolioDefense™.

     d.    Documents sufficient to show the identification of methods, concepts, or ideas imported from the dissertation of Renaud "Ron" Piccinini into any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense™).

     e.    Documents sufficient to show the time horizon, statistical distribution, and confidence interval used in any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense™).

9

f.	Documents sufficient to show the approach used in the implied volatility-based model of any PrairieSmarts tool, software, or system (including but not limited to PortfolioDefense$^{TM}$).

g.	Documents sufficient to show the manner in which PortfolioDefense performs calculations in 3/10 of a second, as PrairieSmarts claims.

The order also contained an "Attorney's Eyes Only" provision, limiting access of the above information but permitting disclosure to TD Ameritrade of "the general nature of the Attorney's Eyes Only Information, without disclosing the specifics of any such information, and to the extent such general disclosure is necessary for advising [TD Ameritrade]."

PrairieSmarts filed this petition for writ of mandamus, and we granted temporary emergency relief, staying the depositions and associated document production granted by Respondent's order.  TD Ameritrade timely filed a response; PrairieSmarts timely filed a reply.

### III.  THE ISSUES PRESENTED

In three issues, PrairieSmarts contends in its petition for writ of mandamus that TD Ameritrade failed to meet its burden under Texas Rule of Civil Procedure 202 to show that the benefit of possibly avoiding the expense of a lawsuit outweighs the burden on PrairieSmarts of disclosing trade secrets, that TD Ameritrade failed to meet its burden under Texas Rule of Evidence 507 to show how lack of presuit access to PrairieSmarts's trade secrets would so impair the presentation of TD Ameritrade's case on the merits that there is a real threat of an unjust result, and that venue for TD Ameritrade's rule 202 petition is not

10

proper in Tarrant County to obtain the deposition of PrairieSmarts's corporate representative.

## IV. STANDARD OF REVIEW

Mandamus relief is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal. *In re Frank Motor Co.*, 361 S.W.3d 628, 630–31 (Tex.) (orig. proceeding), *cert. denied*, 133 S. Ct. 167 (2012); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). A party to a rule 202 petition against whom suit is anticipated may seek review of an allegedly improper rule 202 order via mandamus. *In re Wolfe*, 341 S.W.3d 932, 933 (Tex. 2011) (orig. proceeding); *In re Jorden*, 249 S.W.3d 416, 420 (Tex. 2008) (orig. proceeding); *In re Emergency Consultants, Inc.*, 292 S.W.3d 78, 80 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding [mand. denied]); *In re Hewlett-Packard*, 212 S.W.3d 356, 360 (Tex. App.—Austin 2006, orig. proceeding). A party to a rule 202 proceeding has no adequate remedy by appeal if the trial court abused its discretion by ordering discovery that would compromise procedural or substantive rights. *In re Chernov*, 399 S.W.3d 234, 235 (Tex. App.—San Antonio 2012, orig. proceeding). As in other original proceedings, we review a trial court's order granting a verified petition to take depositions before suit under an abuse of discretion standard. *Patton Boggs LLP v. Moseley*, 394 S.W.3d 565, 568–69 (Tex. App.—Dallas 2011, orig. proceeding).

## V. APPLICABLE LAW

11

## A. Trade Secrets

A trade secret "is one of the most elusive and difficult concepts in the law to define." *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978). Generally, a trade secret is any formula, pattern, device, or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992); *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (orig. proceeding) (quoting *Computer Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1994)). Combinations of disclosed technologies may constitute a trade secret. *See, e.g.*, *Ventura Mfg. Co. v. Locke*, 454 S.W.2d 431, 432–34 (Tex. Civ. App.—San Antonio 1970, no writ).

Texas courts consider the following factors in determining whether the material at issue qualifies for the trade secret privilege: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009) (orig. proceeding); *Bass*,

12

113 S.W.3d at 739. All six factors need not exist to establish a trade secret because trade secrets do not fit neatly into each factor every time and because other factors may also be relevant depending on the circumstances of a particular case. *Bass*, 113 S.W.3d at 740.

A litigant may claim a privilege to refuse to disclose a trade secret so long as the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. Tex. R. Evid. 507. Thus, in determining whether a trade secret must be disclosed, a trial court utilizes a two-step, burden-shifting procedure. *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998) (orig. proceeding). First, the party resisting discovery by asserting a trade secret privilege must establish that the information sought is, in fact, a trade secret. *Id.* Once the party resisting discovery meets this burden, the burden then shifts to the party seeking to obtain discovery concerning the trade secret to establish that the information sought is necessary for a fair adjudication of its claims. *Id.*

The burden on the party seeking discovery of trade secrets requires a demonstration with specificity of exactly how the lack of the trade secret information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat. *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 733 (Tex. 2003) (orig. proceeding). The test cannot be satisfied merely by general assertions of unfairness. *Id.* Nor is necessity established by a claim that the information would be useful rather than necessary. *See In re XTO Res. I, LP*, 248 S.W.3d 898, 905 (Tex. App.—

13

Fort Worth 2008, orig. proceeding). If an alternative means of proof is available that would not significantly impair the presentation of the case's merits, then the information is not necessary. *See Union Pac. R.R. Co.*, 294 S.W.3d at 592–93. Finally, this specificity showing must be made with regard to each category of trade secret information that is sought. *In re Goodyear Tire & Rubber Co.*, 392 S.W.3d 687, 696 (Tex. App.—Dallas 2010, orig. proceeding). Only if the requesting party meets this burden of establishing that the trade secret information is necessary for a fair adjudication of its claims should the trial court compel disclosure of the trade secret information, subject to an appropriate protective order. *Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613.

## B. Rule 202 of the Texas Rules of Civil Procedure

Texas Rule of Civil Procedure 202 permits a person to petition a trial court for authorization to take a deposition before suit is filed in two circumstances: (1) to perpetuate or obtain the person's own testimony or that of any other person for use in an anticipated suit; or (2) to investigate a potential claim or suit. Tex. R. Civ. P. 202.1(a), (b). The trial court may order that the requested deposition be taken only if it expressly finds either (1) that allowing the petitioner to take the requested deposition may prevent a failure or delay of justice in an anticipated suit or (2) that the likely benefit of allowing the petitioner to take the requested deposition to investigate a potential claim outweighs the burden or expense of the procedure. *In re Does*, 337 S.W.3d 862, 865 (Tex. 2011) (orig. proceeding); *Jorden*, 249 S.W.3d at 423.

14

Rule 202 depositions are not now and never have been intended for routine use. *Jorden*, 249 S.W.3d at 423. There are practical as well as due process problems with demanding discovery from someone before telling them what the issues are. *Id.* To prevent an end-run around discovery limitations that would govern the anticipated suit, a rule 202 petitioner cannot obtain by rule 202 what it would be denied in the anticipated action. *Wolfe*, 341 S.W.3d at 933. Accordingly, courts must strictly limit and carefully supervise presuit discovery to prevent abuse of the rule. *Id.*

**C. To Obtain Presuit Discovery of Information that Qualifies as Trade Secret Information, the Burdens Imposed Under Rule of Evidence 507 and Rule of Civil Procedure 202 Must Both Be Satisfied**

Rule 202.5 provides, "The scope of discovery in depositions authorized by this rule is the same as if the anticipated suit or potential claim had been filed." Tex. R. Civ. P. 202.5. Thus, the burden-shifting procedure utilized when a party to a lawsuit resists discovery by asserting the trade secret privilege set forth in rule 507 of the rules of evidence is equally applicable when a party resists discovery sought by a rule 202 petition by claiming trade secret privilege.[7] *Accord Wolfe*, 341 S.W.3d at 933 (recognizing presuit discovery under rule 202 is the same as if the anticipated suit or potential claim had been filed).

---

[7]This is the position taken by TD Ameritrade; it argues that "the Rule 507 analysis applicable here should be exactly the same as it would be had TD Ameritrade actually filed its trade secret misappropriation claim first and then sought the same discovery."

15

A rule 202 petitioner must also establish either that allowing the requested deposition may prevent a failure or delay of justice in an anticipated suit or that the likely benefit of allowing the requested deposition to investigate a potential claim outweighs the burden or expense of the procedure. Tex. R. Civ. P. 202.4(a)(1), (2); *Does,* 337 S.W.3d at 865. This is a totally separate burden than the burden shifted to a party seeking discovery of information proved by the party resisting discovery to constitute trade secret information. *Compare Does*, 337 S.W.3d at 865, *with Bridgestone/Firestone, Inc.*, 106 S.W.3d at 733.

So, a rule 202 petitioner seeking presuit discovery of information that has been proven to be trade secret information must first satisfy the burden under rule 507 of the rules of evidence of demonstrating the necessity for its discovery of the trade secret information by showing with specificity exactly how denial of the discovery will impair the presentation of its case on the merits to the extent that an unjust result is likely. *See Bridgestone/Firestone, Inc.*, 106 S.W.3d at 733; *Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613. If a rule 202 petitioner satisfies this burden of showing the necessity for discovery of the trade secret information, the rule 202 petitioner must next show that it is entitled to obtain such trade secret information presuit because allowing the requested deposition and associated document production may prevent a failure or delay of justice in an anticipated suit or that the likely benefit of allowing the requested deposition and associated document production to investigate a potential claim outweighs the burden or expense of the procedure. Tex. R. Civ. P. 202.4(a)(1), (2); *Does*, 337

16

S.W.3d at 865.  In summary, a rule 202 petitioner seeking presuit discovery of information that has been proven to be trade secret information must satisfy both of the two distinct and separate burdens imposed under rule 507 of the rules of evidence and under rule 202 of the rules of civil procedure.  *See Hewlett-Packard*, 212 S.W.3d at 363–64 (addressing both burdens); *In re Rockafellow*, No. 07-11-00066-CV, 2011 WL 2848638, at *3 (Tex. App.—Amarillo 2011, orig. proceeding) (mem. op.) (same).

## D.  Analysis

### 1.  PrairieSmarts Established that the Information Sought by TD Ameritrade Concerning PortfolioDefense™ Constitutes Privileged Trade Secret Information

Dr. Piccinini explained in his affidavit that PortfolioDefense™ is "based on my life['s] work in this area and put into functional computer code using Mr. Rockwell's computer programing expertise."  He stated that the details of how PortfolioDefense™ works and how it was developed are not known outside of PrairieSmarts and that it cannot be duplicated by others without access to PortfolioDefense™'s underlying programming code and its models.  Dr. Piccinini and Rockwell are the only PrairieSmarts employees with access to the PortfolioDefense™ computer code and to the details of the methods and models used in PortfolioDefense™; Nagy and Chochon do not have access.  The secrecy of PortfolioDefense™ is guarded by restricted access to its programming code and models through multiple layers of authorization by limiting access to Dr. Piccinini and Rockwell, by storing the PortfolioDefense™ information on secured

17

servers protected by a commercial grade firewall, and by refusing to disclose or share the PortfolioDefense[TM] software or its underlying models with any third parties. PortfolioDefense[TM] is the only asset of PrairieSmarts and is extremely valuable to PrairieSmarts. According to PrairieSmarts, PortfolioDefense[TM] is the only product of its kind that provides individual investors with information on all types of investments so that the value of PortfolioDefense[TM] is significant not only to PrairieSmarts but also to its competitors. At the time Dr. Piccinini signed his affidavit, PrairieSmarts had expended $300,000 to $850,000 and had spent months to develop PortfolioDefense[TM]. Dr. Piccinini further stated in his affidavit that "PortfolioDefense cannot be duplicated by others without access to PortfolioDefense's underlying programming and its models. Others may try to develop a similar product, . . . but while any such product may perform similar to PortfolioDefense, it could not result in the same output assessment of risk even with identical input parameters." The documents produced by PrairieSmarts for *in camera* review by Respondent likewise support the trade secrets privilege asserted by PrairieSmarts.[8]

---

[8]TD Ameritrade contends that PrairieSmarts does not rely on the documents themselves to meet the burden of establishing trade secret status. But Relators' unopposed motion to file documents under seal that was filed in this court explained that PrairieSmarts submitted for *in camera* review by Respondent the documents that it contends are protected and requests that those documents be filed under seal in our court as part of the mandamus proceeding so that we may examine all of the evidence considered by Respondent. Thus, the documents were before Respondent and are before us in addressing the issue of trade secret status.

18

Applying the trade secret factors enunciated by the Texas Supreme Court, each of the factors weighs in favor of Relators; the record establishes and we hold that Relators met their burden of showing that all but one category of the information sought by TD Ameritrade—both by asking deposition questions on the topics listed above[9] with the exception of deposition topic (h) and by production of documents in the categories listed above—constitutes trade secret information.[10] *See, e.g.*, *Union Pac. R.R. Co.*, 294 S.W.3d at 591–92 (applying factors and holding "Union Pacific's affidavits establish trade secret protection under the Restatement factors"); *Bass*, 113 S.W.3d at 739–42 (applying factors and holding that relator's evidence, including affidavits, established that "seismic data and its interpretations are trade secrets" although the fifth factor did not weigh in favor of trade secrets protection); *Rockafellow*, 2011 WL 2848638, at *3 (applying factors and holding that relator's affidavit established that relator's supplier list and information related to the identities of suppliers were trade secrets).

---

[9]*See In re Lowe's Cos.*, 134 S.W.3d 876, 879–80 (Tex. App.—Houston [14th Dist.] 2004, orig. proceeding) (addressing assertion of trade secret privilege to information sought in a deposition).

[10]Respondent's order, although containing the "Attorney's Eyes Only" provision, did not make an express finding that PrairieSmarts had established that information sought by TD Ameritrade constituted trade secrets; TD Ameritrade asserts in its response to PrairieSmarts petition for writ of mandamus that the information is not subject to a trade secret privilege. As set forth above, the record conclusively establishes that PrairieSmarts proved its trade secret privilege, except with regard to deposition topic (h).

## 2.  TD Ameritrade's Burden Under Rule of Evidence 507 Not Satisfied

Once PrairieSmarts met its burden to establish that the information sought by TD Ameritrade constituted privileged trade secret information under rule 507 of the Texas Rules of Evidence, the burden then shifted to TD Ameritrade to show that the trade secret information sought is necessary for a fair adjudication of TD Ameritrade's claims.  *See Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613.  In its second issue, PrairieSmarts argues that TD Ameritrade did not satisfy this burden because TD Ameritrade did not produce any evidence or expert testimony to support its contention that the trade secret information sought by TD Ameritrade from PrairieSmarts is necessary to support any claim against PrairieSmarts.[11]  According to PrairieSmarts, TD Ameritrade has not identified any injustice that will ensue if it is not granted pre-suit access to the

---

[11]PrairieSmarts also argues that TD Ameritrade cannot meet its burden of establishing that the trade secret information sought by TD Ameritrade is necessary for the fair adjudication of the merits of an existing claim because there is no existing claim.  *See, e.g.*, *Bass*, 113 S.W.3d at 743 (explaining in a non-rule 202 case that "in order for trade secret production to be material to a litigated claim or defense, a claim or defense must first exist" and holding as a matter of law the claim did not exist); *Hewlett-Packard*, 212 S.W.3d at 363  (citing *Bass* in a rule 202 proceeding for the proposition that "[i]n order for a trial court to determine whether the trade secret production is necessary for a fair adjudication of a claim or defense, a claim or defense must first exist" and holding that, because no claims existed, the required showing of a specific, real threat of an unjust result as opposed to a theoretical, possible threat of an unjust result was not possible).  In light of rule 202.5's provision that "[t]he scope of discovery in depositions authorized by this rule is the same as if the anticipated suit or potential claim had been filed," we decline to hold that a rule 202 petitioner can never obtain presuit discovery of trade secret information simply because a suit has not been filed.

PortfolioDefense programming but has demonstrated only that it would be convenient, possibly less expensive, and a source of "comfort" to it regarding the alleged misuse of its property.

TD Ameritrade contends that it met its burden of establishing necessity under the rule 507 burden-shifting analysis. It references the facts that it presented at the hearing in the trial court on its rule 202 petition—these are the same facts contained in the three demonstrative exhibits titled, "Facts About PrairieSmarts's Principals," "Timeline," and "Facts Justifying Investigation." These facts, TD Ameritrade contends, indicate "the highly suspect circumstances at play here." TD Ameritrade asserts that it established necessity because "the [trade secret] information at issue is the very subject of TD Ameritrade's claim of misuse or misappropriation."

The facts relied upon by TD Ameritrade to justify investigation into a claim against PrairieSmarts are facts relevant to the rule 202 burden, not to the burden shifted to TD Ameritrade under rule 507. That is, the facts contained in the three demonstrative exhibits titled, "Facts About PrairieSmarts's Principals," "Timeline," and "Facts Justifying Investigation" are relevant to establishing whether TD Ameritrade met its rule 202 burden to show that the benefit of allowing TD Ameritrade to take the requested depositions to investigate a potential claim for misuse or misappropriation of proprietary information outweighs the burden and expense of the procedure. But these facts do not rise to the level of a particularized showing that PrairieSmarts's trade secret information is necessary

21

to enable TD Ameritrade to prove of one or more material elements of its claims against PrairieSmarts and that it is reasonable to conclude that the information sought is essential to a fair resolution of a misuse or misappropriation lawsuit against PrairieSmarts—facts required by the rule 507 burden.[12]  *See Bridgestone/Firestone, Inc.,* 106 S.W.3d at 732; *Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613.  The facts justifying an investigation alleged by TD Ameritrade and asserted at the hearing on its rule 202 petition concerning the "highly suspect circumstances at play here" certainly establish that PrairieSmarts's trade secret information might be useful to TD Ameritrade in prosecuting a lawsuit.  But merely proving that trade secret information might be useful—even useful in preparing an expert report with the least amount of uncertainty—does not prove that disclosure of the trade secret information is necessary or essential to a fair resolution of TD Ameritrade's claims.  *See Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 611; *XTO Res. I, LP*, 248 S.W.3d at 905.  Although the facts justifying an investigation by TD Ameritrade demonstrate the *possible* threat of an unjust result in a misuse or misappropriation of trade secrets claim, they do not, standing alone, satisfy the required higher standard of demonstrating a *real* threat of an unjust result.  *See Bridgestone/Firestone*, 106 S.W.3d at 734 (explaining that "[t]he mere possibility of unfairness is not enough to warrant disclosure" of trade secret information).  The facts justifying an investigation by

---

[12]TD Ameritrade does not link the requested trade secret discovery to proof of any element of any cause of action.

TD Ameritrade likewise do not establish that the only means available to TD Ameritrade to discover whether Dr. Piccinini, Chochon, Nagy, and Rockwell misused or misappropriated TD Ameritrade's confidential, proprietary information is by the production of the trade secret documents and information listed in TD Ameritrade's rule 202 petition and ordered produced by Respondent. *See Union Pac. R.R. Co.*, 294 S.W.3d at 593.[13] In summary, the facts presented by TD Ameritrade as justifying an investigation are relevant to a determination of rule 202.4(a)(2)'s requirement that "the likely benefit of allowing the [rule 202] petitioner to take the requested deposition to investigate a potential claim outweighs the burden or expense of the procedure,"[14] but they do not satisfy TD Ameritrade's burden under rule 507 to establish "with specificity exactly how the lack of the [trade secret] information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *Bridgestone/Firestone, Inc.*, 106 S.W.3d at 733.

---

[13]While evidence that trade secret information is not available through any other means is not a required showing, it is evidence supporting a finding of necessity for disclosure. *See Union Pac. R.R. Co.*, 294 S.W.3d at 593.

[14]TD Ameritrade also argues that Respondent "would have been within its discretion to include consideration of the protective order's terms and conditions in its weighing of the ultimate likely benefit and the burden." That a trial court has ordered the parties to enter into a protective order with respect to trade secret information, however, does not dispense with the requesting party's burden to establish the necessity for the discovery of the trade secret information. *See Hewlett-Packard*, 212 S.W.3d at 364 (citing *Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 610).

Because PrairieSmarts established that all of the information sought by TD Ameritrade in its verified rule 202 petition, with the exception of deposition topic (h), constitutes trade secret information, and because TD Ameritrade failed to satisfy the burden under rule 507 of the rules of evidence of establishing necessity, we hold that Respondent abused his discretion by ordering the presuit depositions and the document production. *See Bass*, 113 S.W.3d at 738 ("If a trial court orders production once trade secret status is proven, but the party seeking production has not shown a necessity for the requested materials, the trial court's action is an abuse of discretion."). We sustain Relators' second issue.[15]

## VI. CONCLUSION

Having determined that Respondent abused his discretion by issuing an order permitting presuit discovery of information and documents that were proven to be subject to a trade secrets privilege in the absence of proof of necessity by TD Ameritrade, we conditionally grant the writ. Respondent is directed to vacate his September 18, 2013 order authorizing the presuit depositions of Rockwell and PrairieSmarts and compelling the production of documents concerning PortfolioDefense™.[16] Because we are confident that Respondent will comply

---

[15]Because PrairieSmarts's second issue is dispositive, we need not address its other issues.

[16]Although deposition topic (h) in TD Ameritrade's rule 202 petition does not seek trade secret information, because rule 202's benefit-burden analysis will be different given the viability of only one topic on which only Rockwell may be

24

with this directive, the writ will issue only if Respondent fails to do so. Our disposition of this original proceeding serves to lift the stay previously imposed by this Court. *See* Tex. R. App. P. 52.10(b).

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and MEIER, JJ.

MEIER, J. filed a concurring opinion.

DELIVERED: January 23, 2014

---

deposed, this provision must likewise be vacated. Nothing in this opinion, however, precludes further action in the trial court by the parties, if they so choose, to attempt to obtain a presuit deposition concerning deposition topic (h) from Rockwell only, not PrairieSmarts. And nothing in this opinion precludes Respondent from hearing such a request or ruling on it after conducting the rule 202.4(a)(2) benefit-burden test.

25