

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-382-CV

IN RE XTO RESOURCES I, LP,                                          RELATOR
AS SUCCESSOR TO ANTERO
RESOURCES CORPORATION AND
XTO RESOURCES I GP, LLC

------------

## ORIGINAL PROCEEDING

------------

## OPINION

------------

Relator XTO Resources I, LP ("XTO") seeks mandamus relief from a trial court order compelling XTO to furnish to Real Parties in Interest (collectively, "Threshold") data consisting of subsurface gas reserves related to certain gas leases in Wise County, including reserve estimates and future revenue projections. We hold that XTO established that the data are trade secrets and that Threshold failed to show that disclosure of the information is necessary to prevent fraud or injustice, and we conditionally grant the writ of mandamus.

**Background**

Threshold sued XTO, alleging that XTO breached contracts with Threshold by failing to reassign acreage that was not developed in accordance with the continuous-development obligations contained in certain gas leases. Threshold alleges that XTO's failure to reassign the acreage caused it significant damages because the acreage is no longer available for reassignment.

Threshold served requests for production on XTO, seeking, among other things, documents stating XTO's reserve estimates, recoverable gas reserve estimates, and projected future revenues for all wells covered by the leases and identifying "proved undeveloped acreage" and "proved developed not producing acreage" on the leases. XTO objected to the requests, asserting that the information "is confidential and proprietary and closely guarded by XTO" and that Threshold could calculate its alleged damages from publicly-available production data.

Threshold filed a motion to compel, arguing that the requested information would "assist" their expert and that XTO's confidentiality concerns could be addressed by a confidentiality agreement. XTO filed a response, asserting that the requested data are trade secrets.

The trial court held a hearing on Threshold's motion to compel. Threshold's expert witness testified at the hearing, and XTO submitted the affidavits of two employees. We will discuss the testimony and affidavits in

detail later in this opinion. At the conclusion of the hearing, the trial court granted the motion to compel and signed an order overruling XTO's objections to five of six requests for production and ordering production of the subject data within fourteen days. XTO petitioned this court for mandamus relief from the order.

## Standard of Review

Mandamus will issue to correct a discovery order if the order constitutes a clear abuse of discretion and there is no adequate remedy by appeal. *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 941 (Tex. 1998) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). A trial court abuses its discretion and no adequate remedy by appeal exists when a trial court erroneously compels production of trade secrets without a showing that the information is "necessary." *In re Bass*, 113 S.W.3d 735, 738, 745 (Tex. 2003) (orig. proceeding).

## Discussion

Under rule of evidence 507, trade secrets are privileged from disclosure if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. TEX. R. EVID. 507. The party asserting a trade secret privilege has the burden of proving that the discovery information sought qualifies as a trade secret. *In re Bass*, 113 S.W.3d at 737; *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 612–3 (Tex. 1998); *see also In re CI Host, Inc.*, 92 S.W.3d 514,

3

516 (Tex. 2002). The burden then shifts to the party seeking the trade secret disclosure to establish that the information is necessary for a fair adjudication of a claim or defense in the litigation. *In re Cont'l Gen. Tire, Inc.*, 979 at 612–13.

**1.    Are the data trade secrets?**

To determine whether information is a trade secret, Texas courts apply a six-factor test adopted from the Restatement of Torts. *In re Bass*, 113 S.W.3d at 739. The Restatement factors are (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* (quoting RESTATEMENT OF TORTS § 757 cmt. B (1939) and RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 reporter's n. cmt. d (1995)). The party claiming a trade secret is not required to satisfy all six factors because trade secrets do not fit neatly into each factor every time, and other circumstances may be relevant to the trade secret analysis. *Id.* at 740. A court must weigh the factors in the context of surrounding circumstances to determine whether the data in question are trade secrets. *Id.*

4

In *In re Bass*, the supreme court held that the 3-D geological seismic data at issue in that case were trade secrets. *Id.* at 742. The court first noted that "[i]t is undisputed that the oil and gas industry typically treats seismic data and all other methods of obtaining subsurface geological data as trade secrets." *Id.* at 740–41 (collecting cases from other jurisdictions). The court then analyzed each of the six Restatement factors in light of the circumstances. *Id.* at 741. The evidence established that (1) Bass at all times maintained the confidentiality of the data and never showed the data to anyone except its employees and agents; (2) only four people—all of whom were Bass's agents or employees—had access to the data; (3) the data were kept in a vault accessible only to those who knew the combination, and employees needed a security card just to enter the work area; (4) the data were a "vital commodity" upon which all interpretation of the land's value was based and had a monetary value of between $800,000 and $2,200,000, both of which values highly favored trade secret protection; (5) the seismic shoot took several months to complete at considerable expense and inconvenience, though there was no evidence of a specific monetary cost; and (6) duplicating the data would be difficult and expensive and would require Bass's permission to conduct another seismic shoot, and licensing the exiting data from Bass would also be expensive. *Id.* at 741–42. The court held that all of the factors except the fifth, for which there was no specific evidence, weighed in favor of deeming the data trade

5

secrets. *Id.* at 742. Thus, the court held that the data and its interpretations were trade secrets. *Id.*

In this case, XTO presented evidence on all six factors by way of affidavits—evidence that is similar to the evidence in *In re Bass*. But before we turn to the affidavits, we must consider XTO's assertion that Threshold conceded that the data are trade secrets at the hearing on the motion to compel. At the hearing, Threshold's counsel argued as follows:

> We've also, I think, simplified that issue for the Court, your Honor, because I think both parties, by looking at the briefing, agree that *there's a two-part test*.

> This first part being whether or not the information being requested by [Threshold] is confidential. *And we concede it's confidential. We're not fighting about that.*

> They, being the Defendant, XTO, has submitted two affidavits to establish the confidentiality of the information we're seeking.

> . . . .

> I think we'd be disingenuous to this Court to argue over that issue.

> . . . .

> *The second issue*, your Honor, the one that entitles us to this information, *is whether or not it's necessary*, and whether or not there's good cause for it to be disclosed. [Emphasis added.]

Threshold's counsel then presented testimony from its expert witness, Richard Strickland, regarding the usefulness of the data in completing Strickland's

6

analysis. At no time during the hearing did Threshold specifically address the question of whether the data are trade secrets.

In its brief in this court, Threshold denies that it conceded that the data are XTO's trade secrets. But it is difficult to fathom what Threshold intended to concede if it did not concede that the data are trade secrets. The quoted portion of counsel's trial court argument paraphrased the two-part, burden-shifting test governing the disclosure of trade secrets, i.e., (1) the information's trade-secret status and (2) the necessity of the information to a fair adjudication of a claim or defense. The remainder of counsel's argument focused solely on the necessity of the information to a fair adjudication, just as though the information's trade-secret status were conceded or established beyond dispute. But for the fact that counsel did not say the words "trade secret" in his argument, it would appear to be a clear concession that the data are trade secrets.

Nevertheless, because Threshold now denies that it made such a concession and the concession on the record is not unequivocal, we will evaluate the data in light of the six Restatement factors. We conclude that XTO established the data's trade-secret status.

XTO submitted to the trial court the affidavits of two XTO employees: Kenneth Staab, a senior vice president of engineering; and Kara Sherwood, the supervisor of digital log data. Relevant to the first Restatement factor—the

7

extent to which XTO's reserve estimates and projected revenues are known outside of XTO—Staab averred that his entire department, with a staff of thirty-one persons, works exclusively to evaluate XTO's reserves and compile data for XTO's independent contractors who create reserve forecasts for XTO. *See id.* at 741. While some of the underlying data are publicly available, the forecasts and conclusions of XTO and its consultants are not. Staab said that the SEC requires the disclosure of certain global, aggregate information; otherwise, the data are not made publicly available and are not disclosed to anyone outside of XTO, with the exception of the consultants involved in the forecasting process and, on occasion, to working-interest owners who have a need to know the information. While not as compelling as the evidence in *In re Bass*, this factor weighs in favor of trade secret status. *See id.*

The second factor involves the extent to which the information is known by employees and others involved in XTO's business, and the third factor considers the measures taken to control the security of the information. *See id.* at 741–42. Staab averred that the data are carefully guarded and are obtainable only by XTO personnel on a need-to-know basis. He said that the raw data and the reserve evaluations are maintained in a secure area above the company's third floor, access to which requires a card key. Reserve data stored offsite "is stored at places with strict security measures in place." This uncontested evidence suggests that XTO limits the information within its own

organization and vigilantly guards the data, meeting the second and third Restatement factors.

Under the test's fourth factor, the information's value to XTO and its competitors must be taken into account. *See id.* at 742. Staab averred that the information is highly valuable to the company because it directly affects the company's decisions as to whether it is economically feasible to develop a given property. He said that the information gives XTO a competitive advantage in the marketplace and that if the information were disclosed, XTO would lose that advantage because it would give competitors insight into the methodology by which XTO evaluates reserves. While Staab did not state a dollar cost for developing the precise data sought by Threshold, he averred that the thrity-one persons in his department have a collective annual salary "approaching $2,000,000.00" and that XTO pays "hundreds of thousands of dollars" annually to independent consultants to help evaluate its reserves. Though these sums are not attributable to the specific data sought by Threshold, they are some evidence of the information's value to XTO. This factor weighs in favor of trade-secret status. It also weighs in favor of trade secret status on the fifth Restatement factor, which considers the amount of money expended by XTO in developing the data. *See id.*

The final factor—the ease or difficulty with which the information could be properly acquired or duplicated by others—is somewhat less compelling.

9

Staab averred that some of the data underlying its reserve and revenue calculations are publicly available from the Texas Railroad Commission. Likewise, Sherwood averred that well data are available from third-party vendors for a fee and from the Railroad Commission for free. Staab further averred that Threshold could use the publically-available data to develop its own reserve projections. But it is not the underlying data that XTO contends are secret so much as the process of transforming the raw data into reserve estimates and the estimates themselves. In other words, Threshold could use readily available data to make *its own* reserve calculations, but those calculations would not necessarily match those of XTO; and it is the difference between the calculations that XTO claims is a secret that gives it a competitive advantage. Thus, the sixth Restatement factor also weighs in favor of trade secret status.

We therefore hold that the data sought by Threshold are trade secrets protected by rule 507.

## 2. Are the data necessary for a fair adjudication?

We must now turn to the second prong in the rule 507 analysis and determine whether Threshold carried its burden of showing that the reserve and revenue estimates and other trade secrets are necessary to a fair adjudication of Threshold's claims. *See id.* at 743; *In re Cont'l Gen. Tire*, 979 S.W.2d at 613.

The supreme court addressed the question of what a requesting party must show to establish necessity in *In re Continental General Tire.* 979 S.W.2d at 611–12. Looking to the approaches taken by other jurisdictions that had adopted rules identical or virtually identical to rule 507, the court noted that a requesting party must establish more than mere relevance to discover trade secrets; otherwise, the statutory privilege would be meaningless. *Id.* at 611 (citing *Bridgestone/Firestone v. Superior Court*, 9 Cal. 2d 709, 712 (Cal. Ct. App. 1992)). The party seeking to discover a trade secret must make a particularized showing that the information is necessary to the proof of one or more material elements of the claim and that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit. *Id.* It may be theoretically possible for a party to prevail without access to trade secret information and yet be unfair to put him to much weaker proof without the information. *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex. 2003) (orig. proceeding). But the test cannot be satisfied merely by general assertions of unfairness. *Id.* Nor is it enough to show that the information would be useful to the party's expert; the party must show that it is necessary. *In re Cont'l Gen. Tire*, 979 S.W.2d at 611 (analyzing *Bridgestone/Firestone*, 9 Cal. 2d at 713, 716)). The court must weigh the degree of the requesting party's need for the information against the potential harm of disclosure to the resisting party. *Id*. at 613.

With this standard in mind, we turn to the testimony of Threshold's expert witness, Richard Strickland, a petroleum engineer asked to calculate reserve estimates for Threshold for the leases in question.  Strickland testified as follows:

> Q.    Would it *assist you* if you had that information made available to you?
>
> A.    Yes.  I'd like the full suite of logs, in order to do my evaluation; not just . . . the resistivity logs that's available.
>
> . . . .
>
> Q.    And is it necessary for your report to be as thorough as possible to gain access to both [publicly-available logs and XTO's logs]?
>
> A.    My job is to opine a value of the [disputed acreage], had it been developed in a timely fashion.
>
> And in order to bring to the Court a -- number that has the least amount of uncertainty, and to assist the Court in their deliberations.  Then it is common to have what is commonly known as the well file on the -- on the well, and so that would be both internal and external data.
>
> . . . .
>
> Q.    Would it be of benefit to you, and is it necessary for you to see that information [concerning reserve estimates and valuation forecasts] in order to *help* fully prepare your opinion in this case?
>
> A.    *It certainly would be very helpful*, yes.
>
> . . . .

Q. And would that information [concerning wells in the surrounding area] *be of assistance* to you in formulating your opinions?

A. It certainly would.

Q. And is it necessary for you to have data in order to have accurate and complete opinions?

A. *To bring a value number forward with the least amount of uncertainty*; yes, I need all the information I can get. [Emphasis added.]

To summarize, Strickland testified that he "would like" to see a full set of well logs and that these and other data would "assist" and "help" him to prepare a report "with the least amount of uncertainty." Strickland conceded that—as Staab and Sherwood testified—well logs containing at least some of the underlying data were available from other sources. And Strickland did not testify that he could not form an opinion without the requested information.

We hold that Threshold failed to carry its burden of showing that production of XTO's trade secrets is necessary to a fair adjudication. Strickland testified that the data would be helpful, not that they were necessary.[1]

---

[1] The dissent quotes extensively from the argument of Threshold's counsel before the trial court and in its brief in this court that allowing XTO to shield its trade-secret reserve estimates from Threshold while XTO denies that Threshold suffered any damages would work an injustice. But the argument of counsel is insufficient to support the discovery of trade secrets; a party must present evidence. *See In re Cont'l Gen. Tire,* 979 S.W.2d at 615 ("Regardless of whether this theory [argued by counsel] might otherwise justify discovery of the [trade secret information], an issue on which we express no opinion, plaintiffs presented no evidence supporting this theory to the trial court.").

Weighing Threshold's desire for information that would "assist" and "help" its expert prepare a report "with the least amount of uncertainty" against XTO's desire to maintain its competitive advantage by protecting its trade secrets, we hold that the trial court abused its discretion by ordering the production of the data in question.[2]

Having determined that XTO established that the subject data are trade secrets, that Threshold failed to show necessity, and that the trial court abused its discretion by compelling the data's production, we hold that XTO has no adequate remedy at law and is entitled to mandamus relief. *See In re Bass*, 113 S.W.3d at 745.

### Conclusion

We sustain XTO's second issue and do not reach its remaining issues. *See* Tex. R. App. P. 47.1. We conditionally grant XTO's petition for writ of mandamus. We are confident that the trial court will vacate its October 29,

---

Moreover, the trade-secret data identified in counsel's argument is the same data that Strickland testified would "assist" or "help" him; he did not testify that the data were *necessary* avoid injustice.

[2] The parties also argue about whether Threshold and XTO are direct competitors in the oil and gas market. The record is devoid of evidence one way or the other. But even if Threshold does not compete directly with XTO, XTO is entitled to trade secret protection under rule 507 because Threshold failed to show necessity. *See id.* at 615 (holding that plaintiff in defective-tire case, who was clearly not in competition with defendant tire manufacturer, was not entitled to discover manufacturer's trade secrets absent a showing of necessity).

2007 order compelling production, and the writ will issue only if the trial court fails to do so.

ANNE GARDNER
JUSTICE

PANEL B:   CAYCE, C.J.; GARDNER and WALKER, JJ.

WALKER, J. filed a dissenting opinion.

DELIVERED: March 26, 2008



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-382-CV

IN RE XTO RESOURCES I, LP,
AS SUCCESSOR TO ANTERO
RESOURCES CORPORATION AND
XTO RESOURCES I GP, LLC

------------

## ORIGINAL PROCEEDING

------------

## DISSENTING OPINION

------------

I agree with the majority that trade secrets are privileged from disclosure if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. *See* TEX. R. EVID. 507. I also agree with the majority that the party asserting a trade secret privilege has the burden of proving that the discovery sought qualifies as a trade secret and that the burden then shifts to the party seeking the trade secret disclosure to establish that the information is necessary for a fair adjudication of a claim or defense in the litigation. *See In re Bass*, 113 S.W.3d 735, 737 (Tex. 2003) (orig. proceeding); *In re Colonial*

*Pipeline Co.*, 968 S.W.2d 938, 941 (Tex. 1988) (orig. proceeding). I dissent from the majority's opinion, however, because the majority has wholly skipped over the primary argument asserted by Real Parties in Interest (collectively "Threshold") that the trade secret information it seeks will "not tend to work injustice" and is "necessary for a fair adjudication of a defense in the litigation." *See* TEX. R. EVID. 507; *Bass*, 113 S.W.3d at 737.

Relator XTO Resources, I, LP ("XTO"), in its responses to Threshold's requests for disclosure of XTO's defensive theories and the general factual basis for the defenses, specifically asserted that one of its defenses was as follows: "With respect to Plaintiffs' [Threshold's] claims that [XTO] failed to reassign undeveloped portion of the H Leases and Huddleston Trust Leases, Plaintiffs [Threshold] have failed to this point to demonstrate the nature and/or amount of harm, if any, to a legally sufficient degree." Thus, at the trade secrets hearing before the trial court, Threshold argued,

> Your Honor, . . . we think they have, based on their objections, a presentation of management that says we think this well will be worth "X." That's one of the very questions at hand.
>
> . . . .
>
> They can't [hide] their opinions. In other words, they've - - they've had puds on this same acreage. Those puds had some - - value assigned, and as [of] Friday they told us that Plaintiffs have failed to demonstrate the nature and amount of harm in any - - to legal degree of sufficiency.

2

And they're saying there is no damage. They agree that they've breached some obligations that were not damage.

Well, we'd like to show that within their own corporate documents they [have] given value to these leases. They've given reserve estimates to these leases.

Likewise, Threshold, in its reply brief in response to XTO's petition for a writ of mandamus explained to this court,

XTO suggests that, although there was a breach, the damages resulting from that breach are minimal or even nonexistent.

. . . .

In an effort to address damages, Plaintiffs have requested that XTO produce data that supports the calculations of the reserves booked by XTO underlying the Wise County leases. This will help Plaintiffs and their expert(s) verify their damage model. *Of equal if not greater significance, it will enable them to discredit the position currently being taken by XTO*. This latter point, though expressly raised in Plaintiffs' Second Motion to Compel, is wholly ignored by XTO. [Emphasis added.]

Threshold further explained in its brief to this court,

XTO has no basis to contend it did not breach its obligation to reassign approximately 1,249 acres to Threshold. Thus, it simply says its breach did not damage Threshold. It would be patently unfair to permit XTO to tell the jury Plaintiffs are due no damages but not to allow Plaintiffs to see basic data that XTO keeps outside the context of this litigation which Plaintiffs can use to establish their damages. Unless they are allowed to explore this, Plaintiffs cannot receive a fair trial.

. . . .

3

Stated succinctly, and in the language of Rule 507, disclosure is required to prevent an injustice. Without it [disclosure here] Plaintiffs are hampered in refuting XTO's claim that damages are absent.

Thus, in its motion to compel disclosure at the trade secrets hearing, and before this court, Threshold continuously pointed out the injustice of permitting XTO to rely on the defense that Plaintiffs were not damaged by XTO's failure to reassign particular leases to Threshold, but yet to permit XTO to shield from disclosure XTO's own corporate documents showing that internally XTO had assessed a dollar value to the same leases and wells that it had failed to reassign to Threshold.

Because this argument—that allowance of the trade secret privilege would tend to work an injustice by preventing a fair adjudication of XTO's no-damages defense by preventing Threshold from discrediting this position taken by XTO—appears to raise an alternative ground for affirming Judge Fostel's ruling, and because the majority fails to address it, I respectfully dissent.

SUE WALKER
JUSTICE

DELIVERED: March 26, 2008

4