**Opinion issued August 21, 2014**



In The

# Court of Appeals

### For The

# First District of Texas

_____

## NO. 01-14-00149-CV

_____

## IN RE VALERO REFINING – TEXAS, L.P. AND VALERO REFINING CO. TEXAS, Relators

---

### Original Proceeding on Petition for Writ of Mandamus

---

### MEMORANDUM OPINION

This is a mandamus proceeding arising from a pretrial discovery dispute.[1]

In the underlying proceeding, Valero Refining-Texas, LP contests the Harris

County Appraisal District's appraisal of its Harris County refinery for purposes of

assessing ad valorem property taxes for 2012. *See* TEX. TAX CODE ANN. §§ 42.01,

---

[1] The underlying case is *Valero Refining – Texas, LP and Valero Refining Company Texas v. Harris County Appraisal District*, cause number 2012-56551, pending in the 215th District Court of Harris County, Texas, the Honorable E. Palmer presiding.

42.21 (West Supp. 2012).  Valero challenges a trial court order compelling it to produce financial statements and operating business information.  Valero contends that the requested information constitutes trade secrets.  HCAD contends that the information it seeks does not merit trade secret protection and that, in any event, its production is necessary to establish the value of Valero's property.  We conditionally grant mandamus relief.

## Background

Valero owns and operates a refinery in Houston, Texas.  Valero sued HCAD asserting that the appraised property-tax value of the refinery for 2012 was over market and not equal and uniform.  HCAD requested discovery of extensive financial data relating to the market value Valero's refinery business.  For example, HCAD sought production of all documents and tangible things:

- consisting of monthly and annual financial reports of the subject property, including revenue from sales, cost of sales, margins, gross margins, variable and fixed expenses, and net margins (Request 5);

- containing the historical operating income and expenses by product (Request 6);

- evidencing refinery expenses by cost category, including operating personnel, maintenance, chemicals, catalysts, corporate general and administrative expenses, and overhead monthly (Request 7);

- evidencing the quantity of refinery inputs and outputs (Request 9);

- evidencing product volumes (Request 11);

- evidencing quantity of energy consumption (Request 12);

- evidencing utility purchases that indicate quantity and cost of utilities (Request 13);

- containing the most recent Solomon Associates Fuel Refinery Performance Analysis reports and data ("Solomon Report") (Request 23); and

- containing a summary of logistics in and out of the refinery for multiple categories of substances (Request 22).

Valero objected that these discovery requests sought information that is protected by the trade secret privilege. In particular, Valero argues that the document requests include within their scope Valero's extremely secret and sensitive Business Unit Report ("BUR"), which contains Valero's strategic plans and financial statements for all of Valero's properties. Valero also objected that the requests were overbroad, unduly burdensome, and not likely to lead to the discovery of admissible evidence. HCAD moved to compel production, arguing it needed the information to prepare a market-value appraisal to defend against an unequal-appraisal claim using the income appraisal method.

In its response to HCAD's motion to compel, Valero attached the affidavit of Roy G. Martin, Jr., Senior Vice President of Ad Valorem Tax for Valero Refining – Texas L.P. and Valero Energy Corporation. Martin averred that HCAD's requests sought information that constituted Valero's trade secrets. In its response, Valero also argued that the discovery requests were overbroad and burdensome. Valero further objected on the basis that the income and expense information that HCAD sought was irrelevant because the income method of

appraisal was not relevant or applicable here. In reply to Valero's response to HCAD's motion to compel, HCAD offered the affidavits of James L. Watson, a professional engineer engaged by HCAD, and Grady Graham, an HCAD employee, to demonstrate that the requested information was necessary.

On August 9, 2013, the trial court held an evidentiary hearing at which Martin testified that the requested information constituted Valero's trade secrets and that the income method was not an appropriate method of appraisal in this case. On HCAD's behalf, Watson testified that the requested information was necessary to a fair adjudication of the case.

On September 19, 2013, the trial court granted HCAD's motion to compel and overruled Valero's objections. The trial court's order stated that the information sought did not merit trade secret protection and that HCAD established a need for the information.

On October 13, 2013, Valero filed a motion for reconsideration or to stay enforcement of the order granting HCAD's motion to compel because a similar case, *In re Valero Refining-Texas, LP*, 415 S.W.3d 567 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding), was pending before this court. The trial court denied the motion on October 30, 2013.

On November 8, 2013, Valero filed its First Amended Petition. Valero abandoned its market value claim and asserted only that the tax on its refinery was

4

not equal and uniform. On the same day, Valero filed its "Motion to Vacate Portions of Court's September 19 & October 30 Orders Because of Plaintiffs' Abandonment of Market Value Claim." Valero requested that the trial court vacate the portions of the order that required Valero to comply with the previously-objected to HCAD requests. On December 13, 2013, the trial court denied Valero's motion to vacate.

## Discussion

Valero contends that the trial court abused its discretion in ordering Valero to produce the requested information because the information warrants trade secret protection and HCAD failed to establish that the information is necessary to a fair adjudication of this case. Valero also contends that HCAD's discovery requests are irrelevant, overly broad, and burdensome.

### A.    Standard for Mandamus Relief

Generally, the scope of discovery is within the trial court's discretion. *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 941 (Tex.1998) (orig. proceeding) (citing *Dillard Dep't Stores, Inc. v. Hall*, 909 S.W.2d 491, 492 (Tex. 1995) (orig. proceeding)); *In re BP Prods. N. Am. Inc.*, 263 S.W.3d 106, 111 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding) (citing *In re Colonial Pipeline*, 968 S.W.2d at 941). Mandamus relief is available only to correct a "clear abuse of discretion" when there is no adequate remedy by appeal. *Walker v. Packer*, 827

5

S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding). The heavy burden of establishing a clear abuse of discretion is on the party resisting discovery. *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex. 2003) (orig. proceeding) (citing *Canadian Helicopters Ltd. v. Wittig*, 876 S.W.2d 304, 305 (Tex. 1994) (orig. proceeding)). A clear abuse of discretion occurs when a trial court "'reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Walker*, 827 S.W.2d at 839 (quoting *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985) (orig. proceeding)). A trial court has no discretion in determining what the law is or in applying the law to the particular facts. *Id.* at 840. A clear failure by the trial court to analyze or apply the law correctly constitutes an abuse of discretion. *Id.*

**B.    Applicable Law**

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it*." Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). Rule 507 of the Texas Rules of Evidence provides for the protection of trade secrets:

> A person has a privilege, which may be claimed by the person or the person's agent or employee, to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. When disclosure is directed, the judge shall take such

6

> protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require.

TEX. R. EVID. 507. The trade secret privilege seeks to balance two competing interests: a party's intellectual property interest in the trade secret and the fair adjudication of lawsuits. *See In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 612 (Tex. 1998) (orig. proceeding). Rule 507 accommodates both interests by requiring a party to disclose a trade secret only if necessary to prevent "fraud" or "injustice." *Id.* Disclosure is required only if necessary for a fair adjudication of the requesting party's claims or defenses. *Id.*

The party asserting the trade secret privilege has the burden of proving that the discovery information sought qualifies as a trade secret. *In re Bass,* 113 S.W.3d 735, 737 (Tex. 2003) (orig. proceeding). If the resisting party meets its burden, the burden shifts to the party seeking the trade secret discovery to establish that the information is necessary for a fair adjudication of its claim. *Id.* It is an abuse of discretion for the trial court to order production once trade secret status is proven if the party seeking production has not shown necessity for the requested materials. *Id.* at 738.

To determine whether a trade secret exists, the following six factors are weighed in the context of the surrounding circumstances: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of

7

measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009) (orig. proceeding) (per curiam). The party claiming a trade secret is not required to satisfy all six factors because trade secrets do not fit neatly into each factor every time. *In re Bass*, 113 S.W.3d at 740.

Once a trade secret privilege is established, the burden shifts to the party seeking to discover a trade secret to make a particularized showing that the information is necessary to the proof of one or more material elements of the claim and that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit. *See In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730 731–732 (Tex. 2003) (orig. proceeding); *In re Cont'l Gen. Tire*, 979 S.W.2d at 611, 613. "It may be theoretically possible for a party to prevail without access to trade secret information and yet be unfair to put him to much weaker proof without the information." *In re Bridgestone/Firestone*, 106 S.W.3d at 732. But the test cannot be satisfied merely by general assertions of unfairness. *Id.*

Nor is it enough to show that the information would be useful to the party's expert; rather, the party must show that it is necessary. *See In re Cont'l Gen. Tire*,

979 S.W.2d at 611. If an expert can form an accurate opinion on the relevant subject without the trade secrets, then the information is useful rather than necessary. *See In re XTO Res. I, LP*, 248 S.W.3d 898, 905 (Tex. App.—Fort Worth 2008, orig. proceeding) (holding that party failed to show necessity when expert testified that trade secret information would be useful to prepare report with least amount of uncertainty, but opinion could be formed without it). If an alternative means of proof is available that would not significantly impair the presentation of the case's merits, then the information is not necessary. *See In re Union Pac. R.R.*, 294 S.W.3d at 592–93; *In re Cont'l Gen. Tire*, 979 S.W.2d at 615. The court must weigh the degree of the requesting party's need for the information against the potential harm of disclosure to the resisting party. *In re Cont'l Gen. Tire*, 979 S.W.2d at 613. If the requesting party establishes that the documents are necessary, the trial court should ordinarily compel disclosure of the information, subject to an appropriate protective order. *Id.* An appellate remedy does not exist if a trial court orders a party to produce privileged trade secrets absent a showing of necessity. *In re Bass*, 113 S.W.3d at 745.

**C.  Analysis**

**1.  Trade Secrets**

To establish the applicability of the trade secret privilege, Valero offered Martin's affidavit and Martin's oral testimony. Having reviewed each discovery

request and Martin's affidavit and oral testimony supporting Valero's assertion of the trade secret privilege, we conclude that Valero established the applicability of the trade secret privilege.

In determining whether the requested information constitutes a trade secret, we weigh six factors. *In re Union Pac. R.R. Co.*, 294 S.W.3d at 592. Under the first factor, we consider the extent to which the information is known outside Valero's business. *See In re Bass*, 113 S.W.3d at 741. According to Martin's affidavit, the documents requested include personnel and HR documents, confidential business documents, and process-related documents. He averred that the information is confidential and that the process-related documents "are absolutely not known outside VLO and VRT." Similarly, at the evidentiary hearing, Martin testified that the financial and operating information contained in the Business Unit Report, which is within the scope of HCAD's document requests, is "not known to anyone outside of Valero." Because Valero adduced evidence demonstrating that no one outside of Valero has access to the information HCAD seeks to discover, Valero has satisfied this factor. *See id.* at 740 (concluding relator satisfied first factor with testimony that company had not provided outside access to requested data).

Under the second factor, we consider the extent to which the information is known by employees and others involved in Valero's business. *See id.* at 741.

Martin averred that the "documents requested are accessible to only a few people at VRT and at VLO's headquarters." According to Martin's affidavit, less than one-percent of VLO personnel have access to documents that summarize financial performance on a specific refinery basis and VLO's Global Information Security Policies prohibit photocopying such documents. Martin further averred that "[n]o single refinery specific financial information is ever made public. VLO's 10-K, for example, aggregates broad summary data by geographic region. Such aggregate 10-K data for the Refinery would include data for eight (8) refineries."

Likewise, Martin testified at the hearing that "very few people," "less than one percent," have access to any form of these documents. He testified that those people discuss the BUR each month and the meetings are held in the "Emergency Management Center," a secure room with access control. At the hearing, Martin testified that:

> There are lots of people that work on putting the information together for the Business Unit Report or the BUR; but the finished product is seen by [] very few people. And essentially, it's done for the benefit of the most senior management of Valero, which would be, obviously, the CEO, the CFO of Valero, as well as the lead refinery person for Valero, the executive vice president over refinery; and also, the general counsel is usually in these meetings. There may be one or two other folks that have access to the BUR, but the access to the BUR [is] highly regulated and controlled.

Because Valero adduced evidence that only a few Valero employees have access to the data HCAD seeks to discover, Valero has satisfied the second factor. *See id.* at

742 (holding relator satisfied second factor because only four people, all of whom were agents and employees, has access to the data).

Under the third factor, we consider the extent of measures Valero has taken to guard the secrecy of the requested information. *See id.* Martin averred that the documents HCAD seeks to discover are "guarded by VRT and Valero personnel." He averred that Valero uses "security passwords," prohibits leaving the premises or departments with this information, and that "VLO's global Information Security Policies expressly forbid the photocopying of such documents." Similarly, Martin testified that the Business Unit Reports are hand-delivered to authorized recipients in a sealed envelope, and that the recipient must sign for it and is prohibited from duplicating the report and passing it on to someone else. Because Valero adduced evidence that it takes significant measures to guard the secrecy of the requested information, Valero has satisfied the third factor. *See id.* (holding relator satisfied third factor because uncontested evidence showed company "vigilantly guard[ed] the data").

Under the fourth factor, we consider the information's value to Valero and Valero's competitors. *See id.* Martin averred that the "documents would reveal information important to VLO's competitors." According to Martin's affidavit, "a competing refinery with access to this data would know VRT's profit margins" and would be able to undercut VLO "with respect to acquiring crude and with respect

to selling finished product," could use Valero's process methods and formulas, and could "improve its efficiencies to match the efficiencies achieved by VRT." At the hearing, Martin testified that seeing Valero's BUR would be valuable to competitors and that Valero would not want its competitors to see the BUR because that would give the competitor a "very unfair advantage in terms of our profitability or lack of profitability [and] whatever efficiencies we may have." According to Martin, a competitor could "take advantage of that and cut [Valero] out of the market, say a supply market for crude or maybe bid our products against or products in certain areas and take away what market share we have. It will be very detrimental financially to [Valero]." Because Valero offered evidence demonstrating that Valero's information is valuable to Valero and its competitors, Valero has satisfied the fourth factor. *See id.* (holding relator satisfied fourth factor because expert testified data was "vital commodity" and "would be valuable to any oil and gas contractor in the area"); *In re Cayman Island Firm of Deloitte & Touche*, No. 04-01-00491-CV, 2001 WL 1042233, at *4 (Tex. App.—San Antonio Sept. 12, 2001, orig. proceeding) (not designated for publication) (holding affiant's statement that information was "highly confidential and proprietary and would greatly benefit [relator's] competitors," while "sketchy" on details, was sufficient to establish trade secret privilege).

13

In reviewing the fifth factor, we consider the amount of money expended by Valero in developing the information. *See In re Bass*, 113 S.W.3d at 742. In his affidavit, Martin averred that "[a] great amount of money is spent in developing the documents." Regarding the financial reports, he averred that because of the personnel used to develop the documents, their efforts "amount to many thousands of dollars['] worth of productivity." Martin averred that "VRT employs a number of people whose job is to develop these reports [and] [p]ersonnel at VLO's headquarters in San Antonio are charged with the responsibility of reviewing and maintaining this data." Regarding the other documents relating to VRT's process operations, Martin averred that "the majority of the employees of VLO and VRT are involved in creating those documents; it is simply the heart of Valero's refining business." At the hearing, Martin testified that "hundreds of accountants across [Valero's] system" compile the information contained in the BUR on a daily basis and that the information is summarized at the end of each month. Because Valero proffered evidence that it expends considerable resources developing the requested information, Valero has satisfied the fifth factor. *Cf. id.* (not weighing factor in relator's favor because "the record [was] bare of information on this factor").

Under the final factor, we consider the ease or difficulty with which the information could be properly acquired or duplicated by others. *See id.* Martin averred that the documents "could not be developed by anyone other than VLO

14

and VRT [and that] [n]o one else has access to the data necessary to produce them." At the hearing, Martin likewise testified that a non-Valero entity could not duplicate the information contained in the BUR. Because Martin's testimony as a whole constitutes evidence that it would be difficult for another company to duplicate or acquire this information, Valero has satisfied the sixth factor. *See id.* Considering the six factors, we conclude that Valero met its burden to demonstrate that the requested documents merit trade secret protection.

HCAD contends that it did not request the BUR and, therefore, whether the BUR is a Valero trade secret is irrelevant. We disagree. At the hearing, Martin testified that the BUR contains refinery-specific information requested by HCAD. Moreover, Martin testified that Valero regards "the financial information, wherever it is, as a trade secret." Martin testified that "[w]hether it be the income information, the Solomon report, anywhere the information is contained in Valero's records, they are deemed to be a trade secret." Accordingly, we conclude that the BUR may serve as the basis for Valero's trade secret contention.

We hold that the information that the trial court ordered Valero to produce is protected by Texas Rule of Evidence 507. *See In re Bass*, 113 S.W.3d at 741–42.

### 2. Necessary to a fair adjudication of the case

Having determined that the trial court ordered disclosure of trade secrets, we turn to whether HCAD demonstrated that disclosure is necessary to a fair

15

adjudication of this case. *See In re Union Pac. R.R.*, 294 S.W.3d at 592; *In re Cont'l Gen. Tire*, 979 S.W.2d at 613. We conclude that this court's recent case, *In re Valero Refining-Texas, LP*, 415 S.W.3d 567 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding), controls, and, accordingly, we hold that HCAD failed to meet its burden to show that disclosure was necessary to a fair adjudication of this case.

Taxable property is generally appraised at its market value. *See* TEX. TAX CODE ANN. § 23.01(a) (West Supp. 2012). There are three potential alternate methods that may be used to determine the market value of property: cost, income, and market data comparison. *See id.* § 23.0101 (West 2008). HCAD, like the Galveston County Appraisal District ("GCAD") in *In re Valero*, asserts that the financial and operating information that the trial court ordered Valero to produce is necessary to complete an income-method appraisal of the property. *See In re Valero*, 415 S.W.3d at 571. In support of this position, HCAD proffered Graham's affidavit, Watson's affidavit, and Watson's oral testimony.

Watson averred that "it has been my experience that actual buyers and sellers rely upon the income method to determine a sales price for a refinery." Watson testified at the hearing that the income method is the most relevant to finding actual market value because sellers and buyers of refineries use it. In his affidavit, Graham averred that the income approach was the most appropriate

16

appraisal method.  Similarly, in *In re Valero*, an expert for GCAD averred that the income method is a valid and recognized method of determining the market value of refineries that buyers and sellers of refineries often use.  *See In re Valero*, 415 S.W.3d at 571.

HCAD, just as GCAD did in *In re Valero*, also offered into evidence an industry article about appraising refineries that discusses the use of each of the three appraisal methods.  As we noted in *In re Valero*, the article "notes the benefits and shortfalls of each method and concludes that because none of the three are perfect, the most accurate appraisal would take into consideration all three appraisal methods."  *See In re Valero*, 415 S.W.3d at 571.

Taking the same position as it had in *In re Valero*, Valero disputed the relevance of an income-based valuation in the context of appraising its refinery.  To overcome the trade-secret privilege, the evidence must be necessary and not merely relevant.  *See In re Bridgestone/Firestone*, 106 S.W.3d at 732–33*; In re Cont'l Gen. Tire*, 979 S.W.2d at 611; *In re XTO Res. I*, 248 S.W.3d at 905.  HCAD must show that without discovery of the trade secrets, its ability to defend its appraisal will be significantly impaired.  *See In re Union Pacific R.R.*, 294 S.W.3d at 592; *In re Bridgestone/Firestone*, 106 S.W.3d at 733.

In *In re Valero*, GCAD's expert did not conclude that the cost or market-data-comparison methods were inappropriate or inapplicable.  Nor did he conclude

17

that the income method is the most appropriate valuation method or that it was essential to create an accurate appraisal. HCAD seeks to distinguish that case by arguing that, here, Graham and Watson did testify that the income method is the most appropriate method. Even considering that evidence, however, as we noted in *In re Valero*, the industry article produced by HCAD "indicates that an ideal appraisal considers all three appraisal methods, but it also indicates that, depending on the circumstances, each of the three methods can produce a competent appraisal." *In re Valero*, 415 S.W.3d at 571. Therefore, we conclude that the information requested by HCAD is "useful in that it will facilitate an income-method appraisal and perhaps reach an appraisal with more certainty," but not *necessary* because HCAD can complete an accurate appraisal without it. *See In re Valero*, 415 S.W.3d at 571 (citing *In re Bridgestone/Firestone*, 106 S.W.3d at 733; *In re XTO Res. I*, 248 S.W.3d at 905).

HCAD has not shown that cost and market-data-comparison methods will not provide a competent appraisal and evidence of the market value of the property. Accordingly, HCAD has failed to meet its burden of demonstrating that

the trade-secret information is "necessary and not merely relevant."[2]  Therefore, the trial court erred in concluding that the requested information was necessary to a fair adjudication of this case.  Because we hold that the trial court abused its discretion by compelling Valero to produce information protected by the trade secret privilege, we need not address Valero's contentions that the requests are overbroad or unduly burdensome.[3]

## Conclusion

We conclude that HCAD's requests for production seek information protected by the trade secret privilege and that HCAD has not satisfied its burden of demonstrating production of Valero's trade secrets is necessary to the fair adjudication of the case.  Accordingly, we conditionally grant Valero's petition for writ of mandamus and direct the trial court to vacate the portions of its order that compel Valero to respond to HCAD's requests for production 5, 6, 7, 9, 11, 12, 13,

---

[2]  HCAD contends that the trial court's protective order limiting disclosure of confidential information to parties eliminates any potential harm that could result from Valero's production of the requested information.  But whether a protective order is able to limit harm from the disclosure of trade secrets is only a factor if the trade secrets are necessary and must be disclosed.  *See In re Cont'l Gen. Tire*, 979 S.W.2d at 613.

[3]  HCAD relies on *In re MHCB (USA) Leasing & Fin. Corp.*, No. 01-06-00075-CV, 2006 WL 1098922 (Tex. App.—Houston [1st Dist.] Apr. 27, 2006, orig. proceeding) for the proposition that the requested information may be discoverable in an equal and uniform case.  But HCAD's reliance on *In re MHCB* is inapposite because the relator in that case did not assert the trade secret privilege.  The *In re MHCB* court thus held only that the requested information was "reasonably calculated to lead to the discovery of admissible evidence." *See id.* at *4.

22, and 23. We are confident that the trial court will comply, and the writ will issue only if it does not.


Rebeca Huddle
Justice

Panel consists of Justices Keyes, Sharp and Huddle.